**UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | |
|---|---|
| **MARK CAMPBELL,** | |
| **SHERRIE CAMPBELL,** ] | |
| ] | |
| **Plaintiffs,** ] | |
| **vs.** ] | |
| ] | **Case No. 3:19-cv-0151** |
| ] | |
| **CHEATHAM COUNTY SHERIFF'S** ] | |
| **DEPARTMENT,** ] | **Judge Crenshaw** |
| **MUNICIPAL GOVERNMENT OF** ] | **Magistrate Judge Frensley** |
| **CHEATHAM COUNTY,** ] | |
| **JAMES DOUGLAS FOX,** ] | |
| **CHRISTOPHER AUSTIN,** ] | |
| **MIKE BREEDLOVE.** ] | |
| ] | |
| **Defendants.** ] | |

---

## MEMORANDUM OF LAW IN OPPOSITION

## TO MOTION FOR SUMMARY JUDGMENT

## FILED ON BEHALF OF DEFENDANTS MIKE BREEDLOVE

## AND CHEATHAM COUNTY SHERIFF'S DEPARTMENT

---

Police today are also given too little training in counseling and dispute resolution, and what little training they do get in the academy is quickly blotted out by what they learn on the street in the first few months on the job. When you're given an excess of training in the use of force but little in using psychology, body language, and other noncoercive means of resolving a conflict, you'll naturally gravitate toward force.[1]

…

Police today are armed, dressed, trained, and conditioned like soldiers. They're given greater protections from civil and criminal liability than normal citizens. They're permitted to violently break into homes, often at night, to enforce laws against nonviolent, consensual acts – and even then, often on rather flimsy evidence of wrongdoing.[2]

---

[1] Radney Balko, Rise of the Warrior Cop: The Militarization of America's Police Forces at 327.
[2] Balko at 334.

Case 3:19-cv-00151   Document 78   Filed 09/17/20   Page 1 of 15 PageID #: 532

This case involves a nightmarish reality in which two sheriffs' deputies --- clueless about their department's polices on announcement and identification - approached a rural home in the nighttime. Their lack of training resulted in their failure to announce their presence as law enforcement officers. This caused the homeowner to fear for the safety of he and his wife – though he was not armed and held only a cellphone.

One of the officers – who was later fired for lack of truthfulness based on an incident in Nashville – inexplicably fired eight rounds into the Plaintiffs' home. (Deposition of Michael A. Breedlove at pp. 66-67). This officer had "reverted back to his training", according to his boss, the Sheriff of Cheatham County. An obvious lack of training led to the disastrous decision that could have killed innocent, unarmed citizens in the privacy of their home. Only by the grace of God and good fortune were the unarmed plaintiffs not struck and killed by the reckless attempt on their lives by inadequately trained and glaringly incompetent law enforcement personnel.

The officers glaringly violated the principles of privacy in the home. They also flagrantly violated what Justice Louis Brandeis famously called "the right to be let alone -- the most comprehensive of rights and the right most valued by civilized men." *Olmstead v. United States*, 277 U.S. 438, 478 (1928)(J. Brandeis, dissenting).

Instead of apologizing for their egregious conduct, law enforcement outrageously arrested one of the plaintiffs on trumped-up charges of aggravated assault on a police officer. As the Cheatham County Sheriff Michael A. Breedlove testified in his deposition: "I would say it was not his [Mark Campbell] night." (Deposition of Michael A. Breedlove at p. 54).

Fortunately, the judicial system worked at the local level and the bogus criminal charges were dismissed by a general sessions judge in Cheatham County. Now, the plaintiffs seek to vindicate their constitutional rights to be free from excessive force in a federal civil rights lawsuit.

## STATEMENT OF FACTS

On August 21, 2018, the Cheatham County Emergency Communications Center received several 9-1-1 hang-up calls between 9:15 p.m. and 9:19 p.m. (Complaint, n. 13.) Personnel at the Center contacted the Cheatham County Sheriff's Department and mistakenly told them the calls came from the Plaintiffs' home at 2024 Mosley Ferry Road. The Plaintiffs never made any such calls. Apparently, this is not unusual. Cheatham County Sheriff Michael A. Breedlove testified that "[t]here have been cases in which we went to the wrong address …" (Deposition of Breedlove at p. 43). In fact, Cheatham County Sheriff's office even detained an assistant district attorney because they were sent to the wrong address. (Deposition of Breedlove at p. 44). Such is the culture of ineptitude at the Cheatham County Sheriff's Department.

Deputy Sheriffs James D. Fox and Christopher Austin arrived at Plaintiffs' home. Allegedly, they were there "to "check the welfare or figure out the reason for the 9-1-1 call." (Deposition of James Fox, at p. 23; Deposition of Michael A. Breedlove at p. 35). Fox had been with the Department for about seven years until he was terminated in 2019 for untruthfulness and allegedly lied to Metro Law Enforcement in Nashville. (Deposition of Michael A. Breedlove at p. 66-67). Austin had not been with the Department for very long. He later was reassigned to the jail for falling asleep on the job at least twice. (Deposition of Michael A. Breedlove at p. 69-70).

They approached the Plaintiffs' residence but for some reason failed to announce themselves as law enforcement officials. Deputy Fox could not remember the time frame but video evidence clearly shows that there was ample time to announce themselves as law enforcement. For some unknown reason, they failed to announce their presence as law enforcement. (Deposition of James Fox at p. 4). Fox and Austin failed to announce even though law enforcement officers generally announce their presence for the safety of both officers and citizens. (Deposition of Breedlove at p. 62-63).

The job of sheriffs' deputies always is "to deescalate the situation, whatever situation it is." (Deposition of Breedlove at p. 40). Officers Fox and Austin did anything but deescalate the situation. Instead, they escalated it into a near-fatal confrontation.

The deputies tapped on the door and "didn't really knock on the door like law enforcement." (Deposition of Mark Campbell at p. 52). Plaintiff Mark Campbell went to his door not knowing who the individuals were outside his door. Mark Campbell asked if the unknown individuals were armed. He knew someone was outside his home because his security lights went on. (Deposition of Mark Campbell at p. 44). He explains:

> So I asked did they have a gun. And I think I heard somebody say come on out, Mark, what's up with you. I said, well, you've got a gun; I got a gun. And I opened my front door, and I was met with a barrage of bullets.

(Deposition of Mark Campbell at p. 44).

Even the Cheatham County Sheriff Michael A. Breedlove acknowledged that a person at his home at 9:40 p.m. in the evening should be concerned if someone knocks on their front door at that time of the evening. (Deposition of Breedlove at p. 40).

Campbell had no weapon on him but was worried for his safety and that of his wife. He was worried someone was going to come through his front door. (Deposition of Mark Campbell at p. 48). Campbell yelled for his wife to call 9-1-1, that someone was shooting at him. (Deposition of Mark Campbell, p. 50). Mark Campbell at some point in his past had been dragged out of his own home and beaten. (Deposition of Mark Campbell, at p. 136).

Amazingly, Deputy Sheriff James D. Fox opened fire, ultimately firing eight shots into the Campbell home. Fox claimed that he saw Campbell with a firearm. (Deposition of James Fox, p. 25-26). There was no firearm. (Deposition of Breedlove at p. 48). Instead, Mark Campbell had a cell phone. (Deposition of Mark Campbell at p. 113).

Officers thoroughly searched for a weapon in the Campbell home.  They found no weapon. (Deposition of James Fox at p. 18).    But, they arrested Mark Campbell for aggravated assault on law enforcement.   Those charges were dismissed by a general sessions judge.

No reprimand was ever issued to the officers who fired on a home eight times on unarmed individuals.  (Deposition of. Breedlove at p. 47).   No additional training was given to these officers. (Deposition of Breedlove at p. 47).   However, officers now announce their presence at least when they go to Mr. Mark Campbell's home.  (Deposition of Michael A. Breedlove at p. 59).

As a result of the nightmarish and unprovoked shooting attack by the sheriffs' deputies, Plaintiff Sherrie Campbell suffered "severe anxiety after that."  (Deposition of Sherrie Campbell at p. 70).

**LEGAL STANDARD**

Summary judgment is only appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986).  "The moving party bears the initial burden of showing the absence of a genuine issue of material fact." *Plant v. Morton Int'l, Inc*., 212 F.3d 929, 934 (6th Cir. 2000).

A genuine dispute of material fact exists if a reasonable jury—viewing the evidence in favor of the nonmovant—could decide for the nonmovant. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). When there is a genuine issue of material fact, summary judgment is inappropriate. *Henschel v. Clare Cty. Rd. Comm'n*, 737 F.3d 1017, 1022 (6th Cir. 2013).

In considering a motion for summary judgment, "the evidence as well as all inferences drawn therefrom must be read in a light most favorable to the party opposing the motion." *Kochins v.*

*Linden-Almak, Inc*., 799 F.2d 1128, 1133 (6th Cir. 1986); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986).

**ARGUMENT**

Section 1983 liability can attach to governmental entities. *Monell v. Dept. of Social Services*, 436 U.S. 658 (1978). This liability can attach because of a failure to train and when that failure to train rises to the level of deliberate indifference. *City of Canton v. Harris*, 489 U.S. 378, 388 (1989). Even more importantly, this failure to train can arise in the example of a single, egregious instance and the Supreme Court explained that this single instance can arise during the specific example of the police usage of deadly force. *Id.* at 390.

While deliberate indifference is a high standard, such conditions can arise when "in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *Id*. at 390.

The High Court clarified:

> For example, city policymakers know to a moral certainty that their police officers will be required to arrest fleeing felons. The city has armed its officers with firearms, in part to allow them to accomplish this task. Thus, the need to train officers in the constitutional limitations on the use of deadly force, see *Tennessee* v. *Garner*, 471 U.S. 1 (1985), can be said to be "so obvious," that failure to do so could properly be characterized as "deliberate indifference" to constitutional rights.

*Id*. at 390, n. 10.

The Supreme Court's passage quoted above in *Canton* shows beyond a shadow of a doubt that single-incident liability can attach specifically in the context of law enforcement's use of deadly force. *Id*. Even in later decisions, the U.S. Supreme Court has recognized that Canton's "single-incident" liability survives. *See Connick v. Thompson*, 563 U.S. 51, 68 (2011) (noting the

"possibility of single-incident liability"). Single-incident liability attaches when the alleged constitutional violation was an "obvious" consequence of failing to provide specific training. This showing of "obviousness" can establish municipal culpability. *Id*. at 63-64.

I. **The Failure to Train Officers on the Requirement to Announce and Identify Themselves Showed Deliberate Indifference and Directly Led to the Use of Deadly Force.**

In the instant case, the Cheatham County Sheriff's Department failed to train its officers on the requirement to announce themselves at person's homes even when purportedly conducting "welfare checks" on suspect's homes. It was this failure that created the nightmarish scenario for Defendants James Fox and Christopher Fox to engage in egregious excessive force and shoot at an unarmed couple in their own home.

The job of sheriff's deputies is "first of all … to deescalate the situation, whatever situation it is." (Deposition of Breedlove at p. 40). The deputies, from a lack of knowledge about proper procedure, did anything but deescalate the situation. Instead, they escalated it to a situation of near-fatal deadly force.

Defendant James D. Fox, the sheriff's deputy who fired eight shots in the Plaintiff's home, acknowledged that he did not know whether it was standard practice for law enforcement to announce their presence at a person's home:

Q: When you knocked on the front door, did you announce who you were?

A: I did not.

Q: Is that standard practice in a call such as this?

A: Possibly.

(See Testimony of James D. Fox at p. 13).

Fox further testified that he was unclear on the policy regarding announcement:

Q:      Is it policy to announce yourself as law enforcement when doing a knock at 10:00 at night?

A:       Not sure about that one.  Not sure about that policy.

(See Testimony of James D. Fox at p. 37).

Another line of questioning of Defendant Fox again shows the lack of knowledge of personnel on fundamental policies of the department:

Q:      Do you know whether that's policy or not?

A:      I'm not sure if it's a policy that states that every time you initiate contact you have to announce.

Q:      Do you know if there was a policy to that effect at all?

A:      I'm not sure.  I know there's a policy, but I'm not sure if it states whether you have to do it    every time.

(See Testimony of James D. Fox at p. 75-76).

Fox cavalierly dismissed his failing to announce as **_perhaps_** a "policy violation."  He admitted: "It was a policy violation. If I violate a policy, I didn't announce.  That's all it was." (See Testimony of James D. Fox at p. 38).  He later acknowledged that it was "basic" law enforcement policy to announce one's presence.  (_Id_. at p. 38).

These startling admissions by Defendant Fox indicate a glaring lack of training and even basic knowledge about the basic policies of the Cheatham County Police Department.  When officers who are responsible for the life and safety of citizens are unaware of such "basic" law enforcement polices such as announcing one's presence when knocking on a homeowner's door, this amounts to deliberate indifference.

Defendant Breedlove admitted it was "reasonable" for a homeowner to be concerned about his safety when someone knocks on his door at nighttime. (Deposition of Breedlove at p. 40).

Defendant Breedlove at least implicitly acknowledged that there was a failure on policy with regard to identifying and announcing. He admitted in his deposition testimony that the Department has "changed our methods" at least in ow they contact with Plaintiff Mark Campbell:

> Now, we have --- we have --- I know what if's. But we have changed our methods in how we make contact with Mr. Campbell because there have been calls out there since. And so, in Mr. Campbell's case specifically, you know, we pull up, we announce we're there and police come out.

(Deposition Testimony of Breedlove at p. 59).

## II. Shooting at Unarmed People in Their Homes Shows an Appalling Lack of Training.

The failure of Defendants Fox and Austin to identify and announce themselves as police officers set the stage for the subsequent use of deadly force. That failure to identify and announce themselves – and specifically the officers' lack of knowledge about what to do and whether such was police – shows a complete failure on the part of Sheriff Breedlove and the Cheatham County's Sheriff Department to train its personnel.

The shooting itself shows an appalling lack of training. The video evidence in this case shows two law enforcement officers who had no clue on proper law enforcement procedure. Law enforcement's job is to "protect and service", not "shoot on sight." Just an officer believes that a citizen "might" be armed does not give that officer carte blanche to shoot into a home eight times. The officer's belief has to be reasonable.

But, even more importantly for these purposes, Sheriff Breedlove and the Cheatham County police department sent grossly incompetent and under-training officers to a home at night. This abject failure nearly led to two citizens being shot and killed in their own home.

The most damning admission that there was a failure of training with regard to the shooting of unarmed plaintiffs comes from Defendant Breedlove, the Sheriff of Cheatham County. Defendant Breedlove admitted that Officer Fox "**reverted back to his training**" when he fired

multiple rounds into a home at unarmed individuals.  (Deposition of. Breedlove at p. 53) (emphasis added).   Defendant Breedlove admitted that his officers "react[ed] to their training, to their training" when firing multiple rounds into a home at unarmed people.  (Deposition of Breedlove at p. 56).

The only logical interpretation of this statement is that officers who have: not announced their presence; at night; in a rural area; after knocking on the front door of a citizen's home; with no exigent circumstances and no known crime in progress; during what they have argued was a "welfare check;" are **trained** to fire blindly into the home on the highly dubious claim that the homeowner came to his door with what appeared to be a weapon in his hand.  If nothing else does, this statement deserves to be presented to and evaluated by a jury.

## III.   The Frequency of Constitutional Violations Shows a Failure to Train in the Use of Deadly Force

Section 1983 plaintiffs can also establish a failure to train based on the frequency of constitutional violations.  The U.S. Supreme Court explained that the frequency of constitutional violations makes "the need for further training … plainly obvious to the city policymakers." *Canton*, 489 U.S. at 390, n. 10.

The Cheatham County Sheriff's Department – in the words of Sheriff Breedlove himself – "made national headlines" during his tenure when jail personnel "excessively tased" an inmate named Jordan Norris.  (See Deposition of Breedlove at p. 14).   National news outlets reported that video evidence showed Mr. Norris tased at least four times, once for a period of more than fifty seconds, while tied to a chair.[3]   That incident actually led to criminal charges being imposed upon persons under the employ of Sheriff Breedlove.[4]

---

[3] Zuri Davis, "Tennessee Deputy Charged After Videos Show Him Tasing Teen Tied to Chair," Reason.com, 6/27/2018. (Accessible online athttps://reason.com/2018/06/27/tennessee-jordan-norris-cheatham-taser/

[4] See Ben Hall, "Former Cheatham County Jailer Convicted for Repeatedly Tasing Inmate," NewsChannel5.com, Jan. 13, 2020. (Accessible online at https://www.newschannel5.com/news/newschannel-5-investigates/former-cheatham-county-jailer-convicted-for-repeatedly-tasing-restrained-inmate

This stunning use of excessive force became – in the words of Sheriff Breedlove himself – "a viral storm." (Deposition of Breedlove at p. 16). The "viral storm" occurred because Sheriff Breedlove said that the deputies did nothing wrong. "And boy was that a mistake." (Deposition of Breedlove, at p. 18).

Grossly excessive force and indifference to citizens' fundamental constitutional rights is a pattern in the Cheatham County Sheriff's Department. Despite the highly publicized tasing case, the grossly excessive force perpetrated by Cheatham County Sheriff's Department in the Jordon Norris case was repeated again with the grossly excessive force perpetrated upon the Plaintiffs. Even more appalling, the Plaintiffs were not in the jail; they were in the confines of their own home.

## IV. Defendants' Facebook Page Reflects a Fundamental Disregard for the Constitutional Rights of Those Charged with Crimes.

The Cheatham County Sheriff's Department Facebook page is a reflection of Breedlove, as the final policymaker, and his disregard for constitutional rights and constitutional process. Simply put, under our Constitution, persons are presumed innocent. However, Breedlove on multiple occasions regularly stigmatizes and even mocks those who have been arrested of crimes. This creates a culture of disrespect for constitutional rights.

Sheriff Breedlove even acknowledged that he "publicly humiliated" those charged with crimes – persons who are presumed innocent under the protections of the U.S. and Tennessee Constitutions. He testified:

Q:      Do you not believe that there is a certain risk to publicly humiliating someone before they have seen their day in court?

Case 3:19-cv-00151   Document 78   Filed 09/17/20   Page 11 of 15 PageID #: 542

A:      If I'm going to publicly humiliate someone, which is very rare, and I did it a few times early on, I'm not going to use their name.  I did on that one case in which I was sued, which I learned.

But, you know, there are cases that I will write about but I'm not going to use their name, or I don't use their name.

Q:      But, there have been instances where you did use their names?

………..….

A:      There have been a few.  There were ones I wanted to make my point across.

(Deposition of Breedlove at p. 80-81).

Despite the sheriff's claim that he does not use people's names in his publicly humiliating posts, a contemporaneous viewing of the department's Facebook page tells a different story.  (examples throughout on [https://www.facebook.com/Cheatham-County-Sheriffs-Office-130305967034930/](https://www.facebook.com/Cheatham-County-Sheriffs-Office-130305967034930/)). Further, the public comments from citizens on the sheriff's Facebook page simply serve to "fan the flames" of the departments theme of treating people simply accused of a crime as criminals not deserving of constitution rights and due process.

The plain language of 42 U.S.C. § 1983 states in relevant part:

Every person who, under color of any statute, ordinance, regulation, **custom**, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the **deprivation of any rights, privileges, or immunities secured by the Constitution** and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress…

42 USCS § 1983 (**emphasis added**)

The Fifth, Sixth and Fourteenth Amendments to the US Constitution and Article I, Section 8 of the Tennessee Constitution guarantee the presumption of innocence and the protections of due process. Sheriff Breedlove, through his posts on Facebook and his own admissions, ignores these most

Case 3:19-cv-00151   Document 78   Filed 09/17/20   Page 12 of 15 PageID #: 543

fundamental of constitutional rights. This is a glaringly visible message to his constituency and, more importantly, to the officers under his command, that the Cheatham County Sheriff is more concerned with his image as a crusader for the people than as a defender of constitutional rights.

As discussed herein, Deputy Fox admitted to a lack of the existence of some of the most fundamental of law enforcement polices regarding announcing presence, de-escalation and the use of deadly force. Instead, Deputy Fox arrived at the Campbell home in the afterglow of the sensationalist departmental Facebook posts and as a subordinate to a sheriff who has publicly created a culture of "the people's crusader." His egregious actions on the evening of August 18, 2018 were the product of that culture, a lack of training and an absence of a departmental focus on the gravity of his duties and actions.

Given the sheriff's admission, the ultimate issue of whether the Cheatham County Sheriff's Facebook page is a public "window with a view" into the department's cultural disregard for the constitutional rights of individuals suspected or accused of a crime is certainly a matter for interpretation by a jury.

**CONCLUSION**

Defendant Breedlove claims that he doesn't condone the use of deadly force. ("I don't condone anyone using deadly force."). (Deposition of Breedlove at p. 83). But, he has created an atmosphere in which (1) law enforcement officers do not know the policy of announcing and identifying themselves at private homes during the nighttime; (2) law enforcement officers fire into the home of unarmed individuals; (3) law enforcement officers have on more than one occasion – whether in a jail or a home – engaged in grossly excessive force; and (4) those charged with crimes are treated with disrespect publicly.

Collectively, this conduct rises to the level of "deliberate indifference" and creates a jury question on liability for Defendants Breedlove and the Cheatham County Sheriff's Department.

Respectfully submitted,

/s/ *John H. Morris*
JOHN H. MORRIS
BPR # 35789
Nashville Vanguard Law, PLLC
Parkway Towers, Suite 102
404 James Robertson Parkway
Nashville, TN 37219
John.Morris@nashvillevanguardlaw.com
Phone: (615) 229-5529
Fax: (615) 679-9520

   *Attorney for Plaintiffs*

/s/ *Andrew S. Lockert*
Andrew S. Lockert
BPR #36606
Lockert Law, PLLC
112 Frey Street
Ashland City, TN 37015
Phone: 865-776-0623
Fax: 615-792-4867
andrew@lockertlaw.com

   *Attorney for Plaintiffs*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 17th day of September 2020, a true and correct copy of the foregoing has been forwarded via the U.S. District Court Electronic Filing System:

Robyn Beal Williams
211 Seventh Avenue North
Suite 500
Nashville, Tennessee 37219
Phone: (615) 254-3060
*Attorney for Defendants Douglas Fox and Christopher Austin*

Mark Nolan, BPR # 15859
BATSON NOLAN, PLC
121 South Third Street
Clarksville, Tennessee 37040
Phone: (931) 647-1501
Fax: (931) 553-0153
dmnolan@batsonnolan.com
*Attorney for Defendants Cheatham County and Mike Breedlove*


/s/ *John H. Morris*
JOHN H. MORRIS