# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | |
|---|---|
| **MARK CAMPBELL and** | ) |
| **SHERRIE CAMPBELL,** | ) |
| | ) |
| **Plaintiffs,** | ) |
| | )     **NO. 3:19-cv-00151** |
| **v.** | ) |
| | ) |
| **CHEATHAM COUNTY SHERIFF'S** | ) |
| **DEPARTMENT, et al.,** | ) |
| | ) |
| **Defendants.** | ) |

## <u>MEMORANDUM OPINION</u>

Mark and Sherrie Campbell[1] filed this action under 42 U.S.C. § 1983 against the Cheatham County Sheriff's Department ("Sheriff's Department"), the Cheatham County Municipal Government, Cheatham County Sheriff Mike Breedlove in his official capacity, and James Fox and Christopher Austin in their individual capacities as officers for the Sheriff's Department. Before the Court are two Motions for Summary Judgment: one filed by the Sheriff's Department, the Cheatham County Municipal Government, and Sheriff Breedlove (collectively, the "County") (Doc. No. 65); and one filed by Officers Fox and Austin (the "Officers") (Doc. No. 69). Plaintiffs filed a Response to each Motion, (Doc. No. 75 (Response to the County); Doc. No. 78 (Response to the Officers)), and the Officers filed a Reply (Doc. No. 80). For the following reasons, the County's Motion will be granted, and the Officers' Motion will be granted in part and denied in part.

---

[1] For clarity and brevity, the Court may refer to Plaintiffs by their first names below.

# I. Background

## A. Shooting at the Campbell Residence

Around 9:15 p.m. on August 21, 2018, Officers Fox and Austin were dispatched to the Campbell residence after the Cheatham County Emergency Communications Center received three 9-1-1 hang-up calls that it associated with Plaintiffs' address. (Doc. No. 71-1 at 5–6; Doc. No. 78-1 ¶ 2.) Plaintiffs deny any connection to the phone or phone number associated with these calls. (Doc. No. 75-1 ¶¶ 1, 3.) Nonetheless, the parties agree that the Officers drove to Plaintiffs' residence to perform a "welfare check." (Doc. No. 78-1 ¶ 4.)

Around 9:39 p.m., the Officers arrived at Plaintiffs' residence in marked patrol cars equipped with dashboard cameras, wearing uniforms equipped with body cameras. (Doc. No. 75-1 ¶¶ 2, 4–5.) Plaintiffs (Doc. Nos. 8, 27) and the Officers (Doc. No. 73) submitted footage of the ensuing events from Fox's dash-cam and each Officers' body-cam.[2]

The Officers did not activate the emergency lights on their cars, but their headlights remained on and pointed toward Plaintiffs' residence as they approached the residence on foot. (Doc. No. 75-1 ¶ 6.) A porch light controlled by a heat sensor turned on as the Officers approached. (Doc. No. 78-1 ¶ 7; M. Campbell Dep.[3] at 40.) Austin remained on the ground in front of the porch as Fox walked up four steps to a small landing to knock on the door. (Fox dash-cam; Fox body-cam; Austin body-cam.) Fox claims that he observed a security camera on the porch (Doc. No. 71-

---

[2] The Officers also submitted an audio recording of a 9-1-1 call from Sherrie beginning shortly after the shooting and lasting approximately 24 and a half minutes. (See Doc. Nos. 73, 114.) The Court will refer to this recording as "Sherrie 9-1-1 Call."

[3] The Court will refer to the following deposition transcripts, using each deposition's internal pagination, as: Doc. Nos. 67-4, 71-6, 75-2 at 24–39 ("M. Campbell Dep."); Doc. No. 75-2 at 40–44 ("S. Campbell Dep."); Doc. Nos. 67-1, 75-2 at 18–23 ("Fox Dep."); Doc. No. 67-2 ("Austin Dep."); Doc. Nos. 67-3, 75-2 at 4–17 ("Breedlove Dep.").

2 ¶ 3), and Mark testified that he has a fake security camera on the porch to deter neighbors (M. Campbell Dep. at 54).

Based on the three videos supplied by the parties, the Court has established the following timeline of events, beginning with Fox's knock and concluding with Fox firing his gun. The "seconds elapsed" reflects the approximate time of an event after the first knock:

| Seconds Elapsed | Description of Event |
| --- | --- |
| 0 | Fox knocks three times |
| 1–5 | Fox walks down the steps and stands next to Austin |
| 10 | Mark says, "You got a gun?" through the closed door |
| 12–17 | Fox unholsters his gun[4] and walks to the other side of Austin while saying, "Mark . . . come on out Mark, what's up man?" |
| 18 | Mark again says, "You got a gun?"[5] |
| 21 | Fox says, "What's going on Mark?" |
| 23 | Mark says, "I got one too."[6] |
| 24–25 | Fox draws his gun and turns his back to the door as he walks behind Austin |
| 26 | Mark begins to open the door |
| 27 | Fox turns quickly back toward the door |
| 28 | Fox says, "Do what Mark?" and then **fires two shots** toward the door in rapid succession[7] |
| 29 | Austin trips or jumps to the ground |
| 30 | Fox says, "You good?" |
| 31 | Fox **fires six shots** toward the door in rapid succession |

---

[4] This act is not visible from the footage, but Fox claims as much in his declaration. (Doc. No. 71-2 ¶ 4.)

[5] Fox claims that, at this point, he believed that Mark "knew that law enforcement was outside the residence" because of Fox's prior interactions with Mark, Mark's "security lights and camera being on the porch, and [Mark's] questioning." (Doc. No. 71-2 ¶ 4.) The Officers also point to Sherrie's 9-1-1 call, which includes her isolated statement that Mark "woke [her] up screaming, saying something about the police shot into the house." (Doc. No. 75-1 ¶ 29; Sherrie 9-1-1 Call.) Mark, on the other hand, testified that he did not know that law enforcement was outside until later when he went out his back door to "find out who was shooting at [him]" and saw police vehicles in the yard and driveway. (M. Campbell Dep. at 79–80.)

[6] Both Officers claim they feared for their safety at this point. (Doc. No. 71-1 ¶ 3; Doc. No. 71-2 ¶ 4.)

[7] Both Officers claim they believe Mark had a gun when he opened the door. (Doc. No. 71-1 ¶ 5; Doc. No. 71-2 ¶ 4.) Fox testified that he fired his weapon because he "perceived what [he] observed . . . to [be] a firearm." (Fox Dep. at 25–26.) Mark, however, testified that he did not have a gun and that he thinks he had his cell phone in his hand. (M. Campbell Dep. at 45, 48, 72).

3

(Fox dash-cam; Fox body-cam; Austin body-cam.) After the first two shots, Mark fell to the floor inside the house, kicked the door shut, and yelled for Sherrie to call 9-1-1 because "somebody" was shooting at them. (M. Campbell Dep. at 50; S. Campbell Dep. at 33–34). Sherrie was in the bedroom at the time. (S. Campbell Dep. at 33.) The shots did not hit anyone, and law enforcement did not locate a weapon in a subsequent search of the residence. (Doc. No. 75-1 ¶¶ 35–36.)

The Officers then made their way behind a patrol car as Fox reported "shots fired" over the radio. Almost a minute later, Mark yelled profanities at Fox and Austin through the closed door. A few minutes later, Mark opened the door and stood on the porch, holding up a flat, reflective, rectangular item in his right hand. Fox and Austin yelled at him to get on the ground and show his hands. Mark yelled that his phone was in his hand. Mark lifted his empty left hand, yelled he was not getting on the ground, yelled for Fox and Austin to shoot him, yelled profanities, and then went inside and shut the door. About a minute later, Mark again opened the door and stood in the doorway, appearing to talk on the phone and point at Fox and Austin. Fox and Austin yelled at him to show his hands. Mark yelled back and then went inside and shut the door. (Fox dash-cam; Fox body-cam; Austin body-cam.)

Meanwhile, after the Officers returned to the patrol car, they made several statements reflecting that they did not know what, if anything, Mark has holding when he opened the door. For instance, Fox asked, "What did he point at us?" and Austin replied, "I don't know, he just came out the door and pointed something, so I ducked." Fox also reported over the radio that Mark "came out the door with something in his hands." Austin later asked what Mark came "out the door with," and Fox replied, "I don't know, he had something in his hand and he raised it up." Austin responded, "He came out the door with his hand raised, that's where I heard you shooting, I just backed up." (Fox body-cam; Austin body-cam.)

Several other officers responded to the area, one of whom apprehended and arrested Mark in the backyard about 9 minutes after Mark's last interaction with Fox and Austin. (Fox dash-cam; Fox body-cam; Austin body-cam.) On three separate occasions, Fox explained the shooting to other officers on the scene. Each time, Fox stated that he fired after Mark asked if Fox and Austin had a gun, said that he had a gun, opened the door, and "lift[ed] something up." During one of these explanations, Austin stated that Mark "came to the door, had a gun," before trailing off. (Fox body-cam; Austin body-cam.)

After Mark's arrest, Fox and Austin accompanied a Detective to "clear the house." Sherrie was still in the bedroom with the door closed and still on the phone with 9-1-1. Austin and another officer directed Sherrie to come out with her hands visible, and she complied. Austin cuffed and detained Sherrie for about 3.5 minutes while other officers finished clearing the house. The Detective questioned Sherrie, directed Austin to uncuff her, continued questioning her, and then directed her to complete a written statement. Sherrie was crying off and on for much of this interaction until she was taken to complete a statement. (Fox body-cam; Austin body-cam.)

### B. Cheatham County's Practices and Customs[8]

New hires for the Cheatham County Sheriff's Department receive 12 to 14 weeks of training through the Tennessee Law Enforcement Training Academy, during which they "learn all

---

[8] Plaintiffs object to the format of the County's Statement of Undisputed Material Facts. (Doc. No. 78-1 at 1–2.) The Court agrees that the County presented several categories of non-factual statements as statements of fact, including allegations (id. ¶¶ 1–2, 9, 17–18), summarized or quoted deposition testimony (id. ¶¶ 8, 13–15, 19–39, 42–43), and legal conclusions (id. ¶¶ 40–41, 44). This format is improper because a party moving for summary judgment should set forth each *fact* "in a separate, numbered paragraph" that is "supported by specific citation to the record." Local Rule 56.01(b). Regardless, "Rule 56(c)(1)(A) permits a party seeking summary judgment to rely on," among other things, "'depositions' . . . in the record." Mount Vernon Fire Ins. Co. v. Liem Constr., Inc., No. 3:16-cv-00689, 2017 WL 1489082, at *2 (M.D. Tenn. Apr. 26, 2017). Thus, for the purpose of ruling on the pending summary judgment motions, the Court will consider any assertions of fact within the deposition testimony cited in the County's Statement of Undisputed Material Facts. However, the Court will not consider any extraneous, non-material statements within this testimony.

the basic skills," including constitutional law, use of force, physical fitness, and shooting. (Doc. No. 78-1 ¶ 27; Breedlove Dep. at 21.) After this training, new hires are placed on a one-year probation, but they may "start riding within six weeks or two months" based on the evaluation of a supervisor. (Breedlove Dep. at 21.)

All Sheriff's Department officers are required to complete 40 annual hours of "in-service" training, which includes training on the use of deadly force under state law, firearms, emergency vehicles, domestic violence cases, and other areas. (Id. at 23, 25–28.) Officers Fox and Austin each testified that they received training on the use of force. (Fox. Dep. at 16; Austin Dep. at 11.)

It is Sheriff's Department policy to respond to all 9-1-1 hang-up calls, and the response is typically considered a "welfare check." (Breedlove Dep. at 33.) It is not departmental policy for officers to immediately identify themselves as law enforcement when they knock on the door of a residence. (Id. at 37.) Sheriff Breedlove testified that "[i]t depends on the situation itself and the nature of the call," and that for welfare checks, the process typically goes as follows: "[W]e come, we knock on the door, and mostly in all cases somebody on the other end is going to go, 'who is it?' 'Sheriff's office.' Or they're going to look out the window and see that the sheriff's office is here." (Id. at 37–38.) Fox testified that he was trained to announce himself as law enforcement when executing a search warrant. (Fox. Dep. at 10.)

Sheriff Breedlove also personally maintains a Facebook page for the Cheatham County Sheriff's Department. (Breedlove Dep. at 72.) He claims that the purpose of the page is to inform the public about crimes and the Department's efforts to deter them, develop a relationship with the community, and enlist the public's help in locating individuals with outstanding arrest warrants. (Id. at 72–73.) Breedlove testified that he writes "snippets and stories" about criminal activity

6

using "humor [and] seriousness." (Id. at 73–74.) He also testified that he has used the page to "shame[] criminals" to deter criminals and drug dealers. (Id. at 75–76.)

### C. This Lawsuit

On February 16, 2019, Plaintiffs filed this lawsuit asserting four claims. In Count I, Plaintiffs assert that Officer Fox used excessive force against them. (Doc. No. 1 ¶¶ 47–58.) In Count II, Plaintiffs assert that Officer Austin failed to protect them from Fox's use of force. (Id. ¶¶ 59–69.) In Count III, Plaintiffs assert a claim of municipal liability against the County. (Id. ¶¶ 70–81.) And in Count IV, Plaintiffs assert that all Defendants are liable for the Tennessee tort of intentional (or negligent) infliction of emotional distress. (Id. ¶¶ 82–98.) The Officers and the County move for summary judgment on all claims.

## II. Legal Standard

The Court will grant summary judgment to a moving party that shows "there is no genuine dispute as to any material fact" and that it is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine dispute of material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Peffer v. Stephens, 880 F.3d 256, 262 (6th Cir. 2018) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). The Court "must ultimately decide 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" Burgess v. Fischer, 735 F.3d 462, 471 (6th Cir. 2013) (quoting Anderson, 477 U.S. at 251–52). In doing so, the Court "draw[s] all reasonable inferences in the light most favorable to the non-moving party." Davis v. Gallagher, 951 F.3d 743, 747 (6th Cir. 2020) (citing Anderson, 477 U.S. at 251–52). "But where, as here, there is 'a videotape capturing the events in question,' the court must 'view[] the

7

facts in the light depicted by the videotape.'" Green v. Throckmorton, 681 F.3d 853, 859 (6th Cir. 2012) (quoting Scott v. Harris, 550 U.S. 372, 378–81 (2007)).

## III.    Analysis

### A.    Fourth Amendment Claims against the Officers

Counts I and II are asserted on behalf of both Plaintiffs. That is, both Mark and Sherrie assert that Officer Fox used excessive force against them, and that Officer Austin failed to protect them from that use of force. These claims arise under the Fourth Amendment. See Graham v. Connor, 490 U.S. 386, 395 (1989) ("[A]ll claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard."); Pineda v. Hamilton Cnty., Ohio, 977 F.3d 483, 493 (6th Cir. 2020) (collecting cases) ("[A] nearby officer who does not actively participate in the use of excessive force may still violate the Fourth Amendment if the officer fails to intervene to stop a fellow officer's use of such force.") The Court will address two preliminary arguments raised by the Officers before turning to their qualified immunity defense.

### 1.    Statute of Limitations

The Officers contend that Plaintiffs' Section 1983 claim against Officer Fox is barred by the statute of limitations because they did not serve Fox in a timely manner. (Doc. No. 70 at 21–23.) Plaintiffs disagree. (Doc. No. 75 at 15–18.) The Court concurs with Plaintiffs.

For Section 1983 claims, state law determines "the length of the limitations period," as well as the "closely related" issue of how to apply the statute of limitations. Markowitz v. Harper, 197 F. App'x 387, 389 (6th Cir. 2006) (quoting Harris v. United States, 422 F.3d 322, 331 (6th Cir. 2005)). In Tennessee, the limitations period is one year. Jordan v. Blount Cnty., 885 F.3d 413,

8

415 (6th Cir. 2018) (citing Tenn. Code Ann. § 28-3-104(a)). Meanwhile, under federal law, the limitations period starts running "when the plaintiff knows or has reason to know of the injury which is the basis of his action." Johnson v. Memphis Light Gas & Water Div., 777 F.3d 838, 843 (6th Cir. 2015) (quoting Roberson v. Tennessee, 399 F.3d 792, 794 (6th Cir. 2005)).

Here, the shooting incident at Plaintiffs' residence occurred on August 21, 2018, so Plaintiffs had one year from that date to file any Section 1983 claim related to the shooting. Plaintiffs initiated this action well within this deadline by filing the complaint on February 16, 2019. (Doc. No. 1.) The Officers nonetheless argue that Plaintiffs' Section 1983 claim against Officer Fox is untimely because Plaintiffs did not comply with Tennessee Rule of Civil Procedure 3, which establishes that "timely service of process is essential to the commencement of an action such that the statute of limitations is satisfied." Dolan v. United States, 514 F.3d 587, 595 (6th Cir. 2008) (applying Tennessee Rule of Civil Procedure 3 to Bivens claims).

> Tennessee Rule of Civil Procedure 3 provides:
>
> All civil actions are commenced by filing a complaint with the clerk of the court. An action is commenced within the meaning of any statute of limitations upon such filing of a complaint, whether process be issued or not issued and whether process be returned served or unserved. If process remains unissued for 90 days *or is not served within 90 days from issuance, regardless of the reason, the plaintiff cannot rely upon the original commencement to toll the running of a statute of limitations unless the plaintiff continues the action by obtaining issuance of new process within one year from issuance of the previous process* or, if no process is issued, within one year of the filing of the complaint.

Tenn. R. Civ. P. 3 (emphasis added).

Here, process issued for Fox (and the other Defendants) on February 19, 2019. (Doc. No. 5 at 4.) But Plaintiffs did not serve Fox within 90 days of that date. Thus, to satisfy the statute of limitations under Tennessee law, Plaintiffs were required to "obtain[] issuance of new process within one year from" February 19, 2019. See Tenn. R. Civ. P. 3. And Plaintiffs did just that, by

9

obtaining issuance of an alias summons for Fox on January 2, 2020. (Doc. No. 39.) The record reflects that Fox was personally served the next day. (Doc. No. 40 at 2.) Accordingly, by the express terms of Tennessee Rule of Civil Procedure 3, Plaintiffs may "rely upon the original commencement" of the action on February 16, 2019, for purposes of the statute of limitations.

The Officers argue that Plaintiffs served Fox "an invalid summons" because they had yet to be granted an extension of time to serve Fox under Federal Rule of Civil Procedure 4(m). (Doc. No. 70 at 23.) But the question of timely service under Rule 4(m) is distinct from the question of timeliness under the Tennessee statute of limitations. See Farivar v. Lawson, No. 3:14-CV-76-TAV-HBG, 2017 WL 149970, at *6 (E.D. Tenn. Jan. 13, 2017) (quoting Sydney v. Columbia Sussex Corp., No. 3:13-CV-312-TAV-CCS, 2014 WL 7156953, at *5 (E.D. Tenn. Dec. 15, 2014)) ("It's not the failure to serve within the 120 days . . . that has undone the plaintiff here. It is state law, which must be satisfied in addition to the Rule 4(m) requirement."). Non-compliance with Rule 4(m) only affects a state statute of limitations where "the failure to serve process causes the district court to dismiss the action." Sydney, 2014 WL 7156953, at *6 (quoting Mann v. Am. Airlines, 324 F.3d 1088, 1091 (9th Cir. 2003)). That is not the case here, as the Magistrate Judge ultimately granted Plaintiffs' motion for an extension of time to serve Fox under Rule 4(m). (Doc. No. 45.) Thus, Plaintiffs' Section 1983 claims against Fox are not subject to dismissal as untimely under the applicable statute of limitations.

### 2. Seizure of Mark and Sherrie

Next, the Officers argue that Plaintiffs' Fourth Amendment claims fail as a matter of law because neither Mark nor Sherrie were "seized" when Fox fired at Mark and missed. Although Plaintiffs do not directly respond to these arguments, the Court finds summary judgment to be inappropriate on this basis.

10

A citizen has standing to bring a Fourth Amendment claim when he or she is "seized" by a law enforcement officer. See Smoak v. Hall, 460 F.3d 768, 778 (6th Cir. 2005) (quoting United States v. Richardson, 949 F.2d 851, 855 (6th Cir. 1991)) ("The[] safeguards of the Fourth Amendment, 'with respect to police/citizen contact, vest only after [a] citizen has been seized.'"). "A seizure occurs where, 'in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.'" Id. (quoting United States v. Mendenhall, 446 U.S. 544, 544 (1980)).

### a. Mark

The Officers contend that they did not seize Mark within the meaning of the Fourth Amendment because Fox's shots did not strike Mark or cause him to submit to the Officers' authority. (Doc. No. 70 at 9–10.) Even though Mark was not hit by the gunfire, however, a reasonable person in Mark's circumstances would not have believed that he was free to leave the premises. See Floyd v. City of Detroit, 518 F.3d 398, 405–06 (6th Cir. 2008) (rejecting officer's argument he could not have violated a citizen's Fourth Amendment rights by shooting at and missing the citizen); see also Rodriguez v. Passinault, 637 F.3d 675, 687 (6th Cir. 2011) (citations omitted) (stating that it "goes against established law" to believe that a citizen cannot "maintain an excessive force/unreasonable seizure Fourth Amendment claim without having been shot").

The dash- and body-cam footage reflects that Fox knocked on Plaintiffs' front door, responded to Mark's question through the closed door with a command to "come on out," and soon thereafter fired two shots toward Mark as Mark opened the door. Fox fired another six shots at Mark about 3 seconds later. Fox and Austin retreated behind the police cars in the front yard but remained on the scene. And Mark was aware of their continued presence, as reflected by his intermittent exchanges with Fox and Austin through the closed door and from the front porch.

11

Based on this evidence, Fox's shots "ha[d] the intended effect of contributing to [Mark's] immediate restraint" within the residence. See Jacobs v. Alam, 915 F.3d 1028, 1042 (6th Cir. 2019) (quoting Thompson v. City of Lebanon, 831 F.3d 366, 371 (6th Cir. 2016)) (finding seizure where officer shot at and missed a plaintiff within a house who, according to plaintiff, retreated to another part of the residence and only later learned it was law enforcement who shot at him). Accordingly, Mark was seized for Fourth Amendment purposes.[9]

### b.      Sherrie

The Officers also argue that Sherrie was not "seized" because Fox did not know she was in the residence when Fox fired at Mark. (Doc. No. 70 at 17–18.) A seizure occurs "when there is a governmental termination of freedom of movement *through means intentionally applied*." Rodriguez, 637 F.3d at 680 (quoting Brower v. Cnty. of Inyo, 489 U.S. 596–97 (1989) (emphasis in original)). In other words, an officer must "willfull[y]" apply the means by which he terminates a citizen's freedom of movement, but a seizure may "occur[] even when an unintended person or thing is the object of the detention or taking." Id. at 681 (quoting Brower, 489 U.S. at 596).

In Fisher v. City of Memphis, for example, the Sixth Circuit held that "an officer's intentionally applied exertion of force directed at a vehicle to stop it effectuates a seizure of all occupants therein," regardless of "whether the police were aware of [a] passenger's presence in the vehicle." Rodriguez, 637 F.3d at 686 (citing Fisher, 534 F.3d 312, 318–19 (6th Cir. 2000)). The Sixth Circuit reasoned that, "[b]y shooting at the driver of the moving car, [the officer] intended to stop the car, effectively seizing everyone inside, including the [passenger]." Id. at 687

---

[9] That is not to say that a seizure necessarily occurs every time an officer fires his weapon. As the Officers point out, the Sixth Circuit has twice concluded that an officer did not seize a citizen by shooting and missing. (Doc. No. 70 at 9 (citing Cameron v. City of Pontiac, 813 F.2d 782, 785 (6th Cir. 1987) and Adams v. City of Auburn Hills, 336 F.3d 515, 519 (6th Cir. 2003)). But the Sixth Circuit has also clarified that "the key distinction" of these two cases is that they "involved police firing errant shots at a *fleeing* suspect," Floyd, 518 F.3d at 405 (emphasis in original), something not present here.

(quoting <u>Fisher</u>, 234 F.3d at 318). And in <u>Rodriguez v. Passinault</u>, the Sixth Circuit held that <u>Fisher</u> applies even where the passenger is not struck by the officer's gunfire. <u>Id.</u>

Here, following the Sixth Circuit's guidance in <u>Fisher</u> and <u>Rodriguez</u>, the Court concludes that Sherrie was "seized" for Fourth Amendment purposes. It is undisputed that Fox intentionally fired at Mark as Mark opened the front door. Thus, Plaintiffs' residence "was the intended target of [Fox's] intentionally applied exertion of force." <u>Rodriguez</u>, 637 F.3d at 683 (quoting <u>Fisher</u>, 234 F.3d at 318). And by shooting at Mark, Fox intended to acquire physical control over the residence, "effectively seizing everyone inside, including" Sherrie. <u>See id.</u> (quoting <u>Fisher</u>, 234 F.3d at 318–19). Accordingly, even though the Officers were not aware of Sherrie's presence, she was also seized under the Fourth Amendment.

### 3. Qualified Immunity

The Officers next argue that they are entitled to qualified immunity on Plaintiffs' Section 1983 claims. (Doc. No. 70 at 6–17.) The Court analyzes "a defendant's assertion of qualified immunity in two steps: (1) determining whether the defendant violated a constitutional right and (2) deciding whether that right was clearly established at the time of the incident." <u>Fazica v. Jordan</u>, 926 F.3d 283, 289 (6th Cir. 2019) (citing <u>Shreve v. Franklin Cnty.</u>, 743 F.3d 126, 134 (6th Cir. 2014)). As explained below, qualified immunity will be denied on Plaintiffs' excessive force claim against Officer Fox but granted on their failure-to-protect claim against Officer Austin.

#### a. Excessive Force

##### i. Constitutional Violation

To determine if Officer Fox's "use of force was excessive and thus in violation of the Fourth Amendment," the Court considers "'whether [his] actions [we]re objectively reasonable in light of the facts and circumstances confronting [hi]m, without regard to . . . underlying intent or

13

motivation.'" <u>Bard v. Brown Cnty., Ohio</u>, 970 F.3d 738, 753 (6th Cir. 2020) (quoting <u>Graham v. Connor</u>, 490 U.S. 386, 397 (1989)).

Where, as here, an officer uses deadly force, that use of force "is only constitutionally permissible if 'the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others . . . .'" <u>Livermore ex rel. Rohm v. Lubelan</u>, 476 F.3d 397, 404 (6th Cir. 2007) (quoting <u>Tennessee v. Garner</u>, 471 U.S. 1, 11 (1985)). There are "three non-exclusive factors that lower courts should consider in determining the reasonableness of force used: (1) the severity of the crime at issue; (2) whether the suspect posed an immediate threat to the safety of the police officers or others; and (3) whether the suspect actively resisted arrest or attempted to evade arrest by flight." <u>Jacobs</u>, 915 F.3d at 1040 (quoting <u>Livermore</u>, 476 F.3d at 404).

Accepting the facts depicted by the dash- and body-cams, and accepting Plaintiffs' version of facts that are not clear from the footage, a reasonable jury could conclude that Fox's use of force was objectively unreasonable. The Officers do not attempt to argue that the first or third factors mentioned above weigh in their favor, and for good reason. When Fox fired at Mark as he opened the front door, Plaintiffs were not committing a crime; indeed, they were not suspected of being involved in criminal activity of any kind, as it is undisputed that the Officers were dispatched to Plaintiffs' residence for a "welfare check" triggered by 9-1-1 hang-up calls. Plaintiffs also were not resisting arrest or fleeing at the time; Mark was met with gunfire within about two seconds of opening the front door part-way.

Rather, it is the second factor that is in dispute. "In excessive force cases, the threat factor is 'a minimum requirement for the use of deadly force,' meaning deadly force 'may be used only if the officer has probable cause to believe that the suspect poses a threat of severe physical harm.'"

14

Mullins v. Cyranek, 805 F.3d 760, 766 (6th Cir. 2015) (quoting Untalan v. City of Lorain, 430 F.3d 312, 314 (6th Cir. 2005)).

The Officers argue that they "feared for their lives and considered [Mark] a threat" because Mark "advis[ed them] that he had a gun and then proceeded to open his front door with something believed to be a gun in his hand." (Doc. No. 70 at 14.) Given the totality of the circumstances, however, it was not reasonable for Fox to perceive Mark as posing an immediate threat of severe physical harm.

First, while it is undisputed that Mark stated he had a gun, it is important to put that statement in context. To recap, Fox knocked on Plaintiffs' door at 9:30 at night without comment, meaning that the Officers did not announce that they were law enforcement. About 10 seconds later, Mark said, "You got a gun?" through the closed door. Fox responded, while unholstering his gun, "Mark . . . come on out Mark, what's up man?" Mark then repeated, "You got a gun?" Fox said, "What's going on Mark?" And at that point, with the door still closed, Mark stated, "I got one too."[10] Viewing these facts in a light favorable to Plaintiffs, Mark's statement was defensive and did not give Fox and Austin reason to think that Mark intended to use a gun imminently. See Woodcock v. City of Bowling Green, 679 F. App'x 419, 424–25 (6th Cir. 2017) (concluding it was objectively unreasonable for an officer to shoot an individual who "had told the police over the phone that he had a gun").

Moreover, it is not reasonable for an officer to use deadly force on an individual just because he believes that the individual possesses a gun. "[M]erely possessing a weapon is not enough—the officer must reasonably believe the individual poses a danger of serious physical

---

[10] To be clear, Mark testified that he did not, in fact, have a gun at that time, but he did not know who had just knocked on his door and lied about having a gun to deter them from coming inside. (M. Campbell Dep. at 47–48.)

harm to himself or others to justify deadly force." Jacobs, 915 F.3d at 1040 (citing Bouggess v. Mattingly, 482 F.3d 886, 896 (6th Cir. 2007)); see also Thomas v. City of Columbus, Ohio, 854 F.3d 361, 366 (6th Cir. 2017) ("[W]e do not hold that an officer may shoot a suspect merely because he has a gun in his hand. Whether a suspect has a weapon constitutes just one consideration in assessing the totality of the circumstances."). As explained by the Sixth Circuit, "the reasonableness of an officer's asserted fear" of an individual who they reasonably believed to possess a gun "will often turn on whether an armed suspect pointed h[is] weapon at another person." Hicks v. Scott, 958 F.3d 421, 435–36 (6th Cir. 2020) (collecting cases).

Here, a genuine dispute of fact exists on this point. Of the three videos submitted by the parties, only Officer Austin's body-cam depicts Mark opening the door, and only then for a split-second. (See Austin body-cam at 7:17.) This footage depicts an indistinct, shaded figure opening the door part-way; it is unclear whether Mark was holding anything in his hand, and if so, what it looked like. (Id.) Fox testified that he perceived Mark to be holding a gun when Mark opened the door. (Fox. Dep. at 25–26, 29.) But in the immediate aftermath of the shooting, at no point does Fox claim to have perceived Mark as holding a gun, either when discussing the incident with Austin or explaining what happened to other law enforcement officials who arrived on the scene. Law enforcement did not locate any weapon when they searched the residence following the incident. And Mark testified that he did not have a weapon when he opened the door (M. Campbell Dep. at 44–45), although he "think[s] [he] had [his] cell phone in [his] hand" so he could call 9-1-1 if someone was breaking into his car (id. at 48). Given the ambiguity of the video footage, and the conflicting accounts of the parties, material factual disputes preclude a finding that Fox's use of lethal force was objectively reasonable. See Hicks, 958 F.3d at 436 (collecting cases) ("[I]f a

16

suspect possessed a gun, we will generally deny qualified immunity only if there is a genuine dispute of fact as to whether the gun was pointed at someone.").

The two cases on which the Officers primarily rely to argue to the contrary are distinguishable. (See Doc. No. 70 at 13–14 (citing Pollard v. City of Columbus, Ohio, 780 F.3d 395 (6th Cir. 2015) and Simmonds v. Genesee Cnty, 682 F,3d 438 (6th Cir. 2012)). That is, in both Pollard and Simmonds, "the officers' belief that they faced immediate danger did not rest only on indications that [the shooting targets] were armed; the belief also rested on [the targets'] menacing gestures, which were reasonably interpreted as demonstrating an intention to shoot." Knowlton, 726 F. App'x at 331 (distinguishing Pollard and Simmonds). But here, as explained above, genuine factual disputes exist as to whether Mark made a "menacing gesture[] . . . reasonably interpreted as demonstrating an intention to shoot." See id.

### ii.     Clearly Established Right

At the time Fox fired into Plaintiffs' residence, it was clearly established that "using deadly force against a suspect who does not pose a threat to anyone and is not committing a crime or attempting to evade arrest violates the suspect's Fourth Amendment rights." Thompson, 831 F.3d at 372 (citing Murray-Ruhl v. Passinault, 246 F. App'x 338, 347 (6th Cir. 2007) and Ciminillo v. Streicher, 434 F.3d 461, 467 (6th Cir. 2006)); see also Jacobs, 915 F.3d at 1040 (quoting King v. Taylor, 694 F.3d 650, 664 (6th Cir. 2012)) ("It has been clearly established in this circuit for some time that individuals have a right not to be shot unless they are perceived as posing a threat to officers or others."). Of course, the Supreme Court has cautioned that such general statements of the law "do not by themselves create clearly established law outside 'an obvious case.'" White v. Pauly, 137 S. Ct. 548, 552 (2017) (quoting Brosseau v. Haugen, 543 U.S. 194, 199 (2004)). Thus, the Court must consider whether it was clearly established that Plaintiffs had a right to be free from

the use of lethal force "in 'the specific context of the case.'" Mullenix v. Luna, 577 U.S. 7, 16 (2015) (quoting Brosseau, 543 U.S. at 198).

Considering the particularized facts of this case, there is an important factual dispute about Mark's appearance to Fox when Mark opened the front door. Accepting Plaintiffs' version of the facts, he was not holding a gun or a weapon of any kind; he testified that he may have been holding a cell phone, but the extremely brief and indistinct video footage of Mark opening the door does not show him making a menacing gesture or pointing anything at Fox and Austin. On these facts, this case is sufficiently similar to Floyd, a 2008 case in which the Sixth Circuit denied qualified immunity to officers where there was a dispute of fact about whether the shooting target was armed and performed a threatening act before the officers shot at him. See 518 F.3d 407 ("The officers' contrary assertion that Floyd was in fact armed and fired first is simply irrelevant . . . ."). As in Floyd, Fox fired "without (1) announcing [himself] as [a] police officer[], (2) ordering [Mark] to surrender, or (3) pausing to determine whether [Mark] was actually armed." See 518 F.3d at 409. Thus, as in Floyd, the Court concludes that Plaintiffs' right to be free from the use of lethal force was clearly established when construing the facts in their favor.[11] Summary judgment is therefore inappropriate on Plaintiffs' excessive force claim.

### b.    Failure to Protect

Even accepting Plaintiffs' version of the facts, however, they have not demonstrated that Officer Austin violated their constitutional rights. Plaintiffs assert that Austin failed to protect them from Fox's use of force. To prove a constitutional violation by "a nearby officer who d[id] not actively participate in the use of excessive force," a plaintiff must "establish that '(1) the officer

---

[11] The Officers attempt to distinguish Floyd, in part, by arguing that Floyd "claimed that he halted with his hands up and stated, 'I don't have a gun' *before* being shot by unprovoked law enforcement." (Doc. No. 80 at 4 (emphasis added)). However, Floyd claimed he made that statement only "*after* hearing the first shot," which missed. Floyd, 518 F.3d at 402 (emphasis added).

observed or had reason to know that excessive force would be or was being used, and (2) the officer had both the opportunity and the means to prevent the harm from occurring.'" Pineda, 977 F.3d at 493 (quoting Fazica v. Jordan, 926 F.3d 283, 289 (6th Cir. 2019)). The footage submitted by the parties does not support either showing.

First, in the short time period after Fox knocked on the door and before Fox discharged his gun, Austin did not have reason to know that Fox would fire. The amount of time from first knock to first shot was about 28 seconds. During this time, Fox exchanged words with Mark through the closed door, walked to the other side of Austin, and walked behind Austin with his back to the door. Fox also drew his gun as he started walking behind Austin, but that occurred only 3 or 4 seconds before Fox fired the first shot. Austin, meanwhile, remained stationary, such that he was standing between Fox and the door when Mark began to open it. Thus, if Austin knew that Fox was about to shoot toward the door, then Austin also voluntarily stood in the line of fire. The Court will not draw that unreasonable conclusion.

Second, Austin did not have the opportunity and means to intervene in Fox's use of force because the incident did not last long enough for Austin "to both perceive what was going on and intercede to stop it." See Burgess v. Fischer, 735 F.3d 462, 475–76 (6th Cir. 2013) (collecting cases). The amount of time between Fox drawing his weapon and firing at Mark was about 3 or 4 seconds. No reasonable juror could find that Austin committed a constitutional violation by failing to prevent Fox from firing his weapon in this short amount of time. See Bard, 970 F.3d at 753 ("The video of this incident confirms that the other officers did not have the opportunity to prevent any possible harm from occurring, given that the use of force lasted approximately three seconds."). Austin then either tripped or jumped to the ground, where he was in no position to prevent Fox from firing the next six shots. The entire sequence from Fox drawing his weapon to

taking his final shot lasted less than 10 seconds. Again, this brief window of time does not reflect that Austin committed a constitutional violation. See Pineda, 977 F.3d at 493 (quoting Alexander v. Carter for Boyd, 733 F. App'x 256, 265 (6th Cir. 2018)) ("[O]ur caselaw suggests that 'an excessive use of force lasting ten seconds or less does not give a defendant 'enough time to perceive the incident and intervene' to stop such force.'").

Accordingly, the Officers will be granted summary judgment on Plaintiffs' failure-to-protect claim against Officer Austin.

### B. Municipal Liability Claim against the County

Plaintiffs also assert a municipal liability claim against the Cheatham County Municipal Government, the Sheriff's Department, and Sheriff Mike Breedlove in his official capacity. To impose municipal liability under Section 1983, Plaintiffs "must show (1) that they suffered a constitutional violation and (2) that a municipal policy or custom directly caused the violation." Hardrick v. City of Detroit, Mich., 876 F.3d 238, 243 (6th Cir. 2017) (citing Monell v. New York City Dep't of Soc. Servs., 436 U.S. 658, 690–92 (1978)).

### 1. Redundant Party

Initially, the County contends that Plaintiff's official-capacity claims against Sheriff Breedlove should be dismissed as redundant because they are essentially claims against the County, and the County itself is named as a Defendant. (Doc. No. 66 at 7.) Plaintiffs do not respond to this argument, and the Court agrees with the County. See Jackson v. Shelby Cnty. Gov't, No. 07-6356, 2008 WL 4915434, at *2 (6th Cir. 2008 Nov. 10, 2008) ("[T]he district court properly granted summary judgment to the defendants on the claims against the sheriff in his official capacity because those claims mirror the claims against the County, and are therefore redundant."); see also Sagan v. Sumner Cnty. Bd. of Educ., 726 F. Supp. 2d 868, 876 (M.D. Tenn. 2010) ("[A]

claim against an individual in her official capacity is tantamount to a claim against the employer and . . . where, as here, the employer is also sued, the official-capacity suit against the employee is simply redundant and may be dismissed."). Because Plaintiffs bring only official capacity claims against Sheriff Breedlove, he will be dismissed as a party.[12]

### 2.       Policy or Custom

Turning to the substance of this claim, the Court has concluded that the Officers are not entitled to summary judgment on Plaintiffs' Fourth Amendment excessive force claim against Fox. Thus, for Plaintiffs' claims against the County to survive summary judgment, they must demonstrate that the County had a policy or custom that directly caused this asserted constitutional violation.

"There are four methods of proving a municipality's illegal policy or custom: the plaintiff may prove '(1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations.'" Wright v. City of Euclid, Ohio, 962 F.3d 852, 880 (6th Cir. 2020) (quoting Jackson v. City of Cleveland, 925 F.3d 793, 828 (6th Cir. 2019)).

In the Complaint, Plaintiffs allege that: (1) Sheriff Breedlove, the official "responsible for implementing the County's policies," created "a culture and unwritten policy within the Sheriff's Department that encourages disrespect, arrogance, malice and abuse" by maintaining "a departmental Facebook page where it is his regular practice to mock and ridicule citizens who have

---

[12] Although the County does not move for summary judgment on this ground, the Court also notes that Plaintiffs' municipal liability claim against the Sheriff's Department is subject to dismissal because "sheriff's departments are not proper parties to a § 1983 suit." See Mathes v. Metro. Gov't of Nashville and Davidson Cnty., No. 3:10-cv-0496, 2010 WL 3341889, at *2 (M.D. Tenn. Aug. 25, 2010) (collecting cases). However, such a dismissal would not restrict Plaintiffs' ability to pursue their municipal liability claim directly against the County.

been ACCUSED of crimes within the county" (Doc. No. 1 ¶¶ 72–76, 78–79); and (2) the Sheriff's Department "has inadequately trained and/or disciplined its employees in the proper use of deadly force" (id. ¶ 77). As explained below, Plaintiffs have not presented sufficient evidence to support a municipal liability claim based on these allegations.

### a. Facebook Page

As alleged in the Complaint, Sheriff Breedlove's maintenance of the departmental Facebook page implicates two of the four methods for proving an illegal policy or custom. That is, Plaintiffs allege that the "ongoing existence" of the Facebook page maintained by Sheriff Breedlove, an official with final decision making authority, reflects that Breedlove has ratified the unconstitutional acts of Sheriff's Department employees. (See Doc. No. 1 ¶ 75.) Plaintiffs also allege that Breedlove's maintenance of the Facebook page either created or contributed to a custom of tolerance or acquiescence of federal rights violations. (See id. ¶¶ 73, 78.)

Importantly, however, the record does not contain any evidence regarding the specific contents of the Facebook page, so the Court has no basis to conclude that either theory of municipal liability is viable. In the Complaint, Plaintiffs include a hyperlink to the Facebook page with a few purported quotes from it. (Id. ¶ 74.) But Plaintiffs "cannot merely rely on the allegations in their complaint to defeat summary judgment." Tullis v. UMB Bank, N.A., 423 F. App'x 567, 570 (6th Cir. 2011) (citation omitted).

Similarly, in their Response to the County's summary judgment Motion, Plaintiffs include a hyperlink and invite the Court to undertake "a contemporaneous viewing of the department's Facebook page" and the "public comments from citizens." (Doc. No. 78 at 11.) But the Court is not required "to sift through the record in search of evidence to support a party's opposition to summary judgment," Jackson v. Tenn. Dep't of Safety, No. 3:05-CV-231, 2009 WL 1437570, at

22

*15 (E.D. Tenn. May 21, 2009) (quoting Fuentas v. Postmaster Gen. of U.S. Postal Serv., 282 F. App'x 296, 300 (5th Cir. 2008))—much less sift through "inadmissible external hyperlinks that lack a foundation in evidence," see F.T.C. v. OMICS Grp., 374 F. Supp. 3d 994, 1002 n.2 (D. Nev. 2019) (citing Fed. R. Evid. 901(a)). And Plaintiffs do not request that the Court take judicial notice of any specific content from the Sheriff's Department Facebook page.

At his deposition, Sheriff Breedlove discussed his maintenance of the Facebook page in general terms. (See Breedlove Dep. at 72–76.) But without any specific evidence of the Facebook page's content in the record, the Court cannot evaluate the extent to which it may or may not have created or contributed to an illegal policy or custom. Plaintiffs cannot rely on argument and unsubstantiated assertions to present their Facebook-based theories of municipal liability to a jury. See Jones v. City of Franklin, 677 F. App'x 279, 282 (6th Cir. 2017) (citing Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 888 (1990)) ("[C]onclusory allegations, speculation, and unsubstantiated assertions are not evidence, and are not sufficient to defeat a well-supported motion for summary judgment."). Accordingly, in considering Plaintiffs' municipal liability claims, the departmental Facebook page does not factor into the Court's analysis.

### b. Failure to Train

Plaintiffs also allege that Officer Fox's use of force was directly caused by a policy of inadequate training. (See Doc. No. 1 ¶ 77.) "In order to show that a municipality is liable for a failure to train its employees, a plaintiff must establish that: 1) the [municipality's] training program was inadequate for the tasks that officers must perform; 2) the inadequacy was the result of the [municipality's] deliberate indifference; and 3) the inadequacy was closely related to or actually caused the injury." Griffith v. Franklin Cnty., Ky., 975 F.3d 554, 583 (6th Cir. 2020) (quoting Jackson, 925 F.3d at 834).

23

Plaintiffs argue that the Sheriff's Department inadequately trained its officers "on the requirement to announce themselves at person's homes even when purportedly conducting 'welfare checks' on suspect's homes." (Doc. No. 78 at 7.) They also generally argue that "there was a failure of training with regard to the shooting of unarmed plaintiffs." (Id. at 9.)

As to the adequacy of the Sheriff Department's training program, Sheriff Breedlove testified that new hires receive 12 to 14 weeks of training through the state training academy on areas including constitutional law and the use of force. Breedlove also testified that all officers must complete 40 hours of annual training on areas including the use of deadly force under state law. Officers Fox and Austin each testified that they received training on the use of force.

Plaintiffs do not point to any evidence creating a genuine dispute of fact on these claims. But even assuming, without deciding, that the County's training was inadequate in some way, Plaintiffs have not demonstrated that any inadequacy was the result of the County's deliberate indifference. And because a reasonable jury could not find that the County was deliberately indifferent, the Court need not consider whether any inadequacy was closely related to or actually caused the injury. See Zavatson v. City of Warren, Mich., 714 F. App'x 512, 527 n.1 (6th Cir. 2017).

"There are 'at least two situations in which inadequate training could be found to be the result of deliberate indifference.'" Ouza v. City of Dearborn Heights, Mich., 969 F.3d 265, 287 (6th Cir. 2020) (quoting Cherrington v. Skeeter, 344 F.3d 631, 646 (6th Cir. 2003)). "First, and most commonly, a plaintiff can demonstrate deliberate indifference by showing that the municipality has failed to act 'in response to repeated complaints of constitutional violations by its officers.'" Id. (quoting Cherrington, 344 F.3d at 646). Second, "[i]n a 'narrow range of circumstances,'" id. (quoting Bd. of Cnty. Commrs. of Bryan Cnty. v. Brown, 520 U.S. 397, 409

(1997)), "a plaintiff can show deliberate indifference based on 'single-incident liability' if the risk of the constitutional violation is so obvious or foreseeable that it amounts to deliberate indifference for the city to fail to prepare officers for it," id. (quoting Connick v. Thompson, 563 U.S. 51, 63 (2011)). Plaintiffs argue both theories of deliberate indifference, and the Court will address each in turn.

The first type of deliberate indifference requires a plaintiff to "show prior instances of unconstitutional conduct demonstrating that the County has ignored a history of abuse and was clearly on notice that the training in this particular area was deficient and likely to cause injury." Miller v. Sanilac Cnty., 606 F.3d 240, 255 (6th Cir. 2010) (quoting Fisher v. Harden, 398 F.3d 837, 849 (6th Cir. 2005)). To that end, Plaintiffs point to one prior instance of excessive force at the jail. (Doc. No. 78 at 10–11.) But as with the departmental Facebook page, there is not any specific evidence regarding this asserted incident properly before the Court. Rather, in their Response brief, Plaintiffs include two "inadmissible external hyperlinks that lack a foundation in evidence," see OMICS Grp., 374 F. Supp. 3d at 1002 n.2 (citing Fed. R. Evid. 901(a)), without requesting that the Court take judicial notice of any specific information. (Doc. No. 78 at 10.) Accordingly, the summary judgment record does not include evidence of any prior instances of unconstitutional conduct.[13]

Even considering the description of this incident in Plaintiffs' Response, moreover, it is not sufficiently similar to Officer Fox's asserted constitutional violation to support a finding of "prior-instance" deliberate indifference. Plaintiffs assert that, in a highly publicized case, County employees at the jail tased an inmate "at least four times, once for a period of more than fifty

---

[13] The Court notes that Plaintiffs also cite to Sheriff Breedlove's supposed testimony generally discussing this incident on pages 14, 16, and 18 of his deposition transcript. (Doc. No. 78 at 10–11.) But these pages are not included within the excerpts of Breedlove's deposition transcript submitted by the parties. (See Doc. Nos. 67-3, 71-4, 75-2 at 4–17, 78-2 at 4–10, 80-1.)

25

seconds, while tied to a chair." (Doc. No. 78 at 10–11 (footnote omitted)). But "prior examples of wrongdoing must violate the same constitutional rights and violate them in the same way." Berry v. Delaware Cnty. Sheriff's Off., 796 F. App'x 857, 863 (6th Cir. 2019) (citing D'Ambrosio v. Marino, 747 F.3d 378, 388 (6th Cir. 2014)); see also Connick, 563 U.S. at 63 (footnote omitted) ("Because those incidents are not similar to the violation at issue here, they could not have put Connick on notice that specific training was necessary to avoid this constitutional violation."). And a jailer's use of excessive force on a restrained inmate—troubling as it is—is simply not the same type of constitutional violation as an officer's use of excessive force on a free citizen. See Coley v. Lucas Cnty., Ohio, 799 F.3d 530, 537–38 (6th Cir. 2015) (explaining the different standards for excessive force claims brought under the Fourth, Eighth, and Fourteenth Amendments on behalf of free citizens, convicted prisoners, and pretrial detainees, respectively). For all of these reasons, Plaintiffs fail to establish the County's deliberate indifference based on pattern of similar constitutional violations.

Plaintiffs also fail to demonstrate the County's deliberate indifference based on a "single-incident" theory. "'Deliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." Connick, 563 U.S. at 61 (quoting Bryan Cnty., 520 U.S. at 410). "For liability to attach in the instance of a single violation, the record must show 'a complete failure to train the police force, training that is so reckless or grossly negligent that future police misconduct is almost inevitable or would properly be characterized as substantially certain to result.'" Harvey v. Campbell Cnty., Tenn., 453 F. App'x 557, 567 (6th Cir. 2011) (quoting Hays v. Jefferson Cnty., 668 F.2d 869, 874 (6th Cir. 1982)).

The record reflects that Officer Fox received training in the use of deadly force.[14] Plaintiffs have not come forward with evidence that, without providing additional training to its officers, the County "was on notice that . . . it was so highly predictable that sheriff's deputies would misuse deadly force as to amount to conscious disregard for citizens' rights." See Harvey, 453 F. App'x at 567. Plaintiffs also do not provide any authority for the blanket proposition suggested by much of their Response—that the constitution requires an officer to announce himself as law enforcement immediately when he knocks on the door of a citizen's residence for a welfare check. Accordingly, no reasonable jury could find that the County was deliberately indifferent to any inadequacy in the Sheriff Department's training, Plaintiffs' failure-to-train claim fails, and Plaintiffs cannot impose liability on the County for Fox's asserted constitutional violation.

## C. State Law Claim

Finally, Plaintiffs assert a state law claim of intentional (or negligent, in the alternative) infliction of emotional distress against all Defendants. "In Tennessee, '[t]he elements of an intentional infliction of emotional distress claim are that the defendant's conduct was (1) intentional or reckless, (2) so outrageous that it is not tolerated by civilized society, and (3) resulted in serious mental injury to the plaintiff.'" Fisher v. Nissan N. Am., Inc., 951 F.3d 409, 423 (6th Cir. 2020) (quoting Rogers v. Louisville Land Co., 367 S.W.3d 196, 205 (Tenn. 2012)).

### 1. Against the County

The County argues that it is entitled to sovereign immunity from Plaintiffs' state-law claim under the Tennessee Government Tort Liability Act because it arises out of the same circumstances as Plaintiffs' civil rights claims under Section 1983. (Doc. No. 66 at 20–23.) Plaintiffs do not

---

[14] The Court notes that, in arguing that this training was inadequate, Plaintiffs again cite to pages of Sheriff Breedloves's deposition transcript that are not within the record. (See Doc. No. 78 at 9–10 (citing Breedlove Dep. at 53, 56.) To be clear, however, even taking these context-less quotes at face value, Plaintiffs have not put forth any evidence that the County was deliberately indifferent to any inadequacy in training.

27

respond to this argument, and the Court concurs with the County. See Johnson v. City of Memphis, 617 F.3d 864, 872 (6th Cir. 2010) (quoting Tenn. Code Ann. § 29-20-205) (explaining that sovereign immunity applies to claims based on injuries arising "out of . . . civil rights," including Section 1983 claims). For this reason, Plaintiffs' claim of intentional (or negligent) infliction of emotional distress against the County will be dismissed as a matter of law.

### 2. Against the Officers

The Officers first argue that they are immune from Plaintiffs' alternatively pleaded claim for negligent infliction of emotional distress. (Doc. No. 70 at 18 n.1.) Plaintiffs do not respond to this argument, and the Court agrees with the Officers. See Adams v. Diamond, No. 3:18-cv-00976, 2019 WL 314569, at *4 (M.D. Tenn. Jan. 24, 2019) (citing Sallee v. Barrett, 171 S.W.3d 822 (Tenn. 2005)) (noting the Tennessee Supreme Court's holding that a police officer is immune from a claim for negligent infliction of emotional distress).

As the Officers recognize, however, they are not immune from Plaintiffs' claim for *intentional* infliction of emotional distress ("IIED"). They nonetheless argue that they are entitled to summary judgment because Plaintiffs have not demonstrated the second and third elements of this claim—outrageous conduct and serious mental injury.[15] (Doc. No. 70 at 21.) In Response, Plaintiffs contend that they "can show all three elements" (Doc. No. 75 at 14), but they have not advanced even a cursory argument that they suffered serious mental injuries.

Plaintiffs' only reference to a mental or emotional injury of any kind is in their Statement of Fact section, where they quote Sherrie's deposition testimony that she suffered "severe anxiety"

---

[15] The Court does not consider the Officers' argument, raised for the first time in their Reply, that Fox and Austin did not act intentionally or recklessly. (See Doc. No. 80 at 5); Traveler's Prop. Cas. Co. of Am. v. Hillerich & Bradsby Co., 598 F.3d 257, 275 (6th Cir. 2010) (citing Scottsdale Ins. Co. v. Flowers, 513 F.3d 546, 552–54 (6th Cir. 2008)) ("Arguments raised only in reply, and not in the original pleadings, are not properly raised before the district court . . . .").

after the shooting incident. (Doc. No. 75 at 4.) And Plaintiffs contend that their IIED claims should be decided by a jury because they are similar to an IIED claim that survived summary judgment in Robinson v. City of Memphis, 340 F. Supp. 2d 864, 873–74 (E.D. Tenn. 2004). (Doc. No. 75 at 14–15.) Although Robinson also involved a police shooting, 340 F. Supp. 2d at 866, it is otherwise readily distinguishable from this case. There, the plaintiff claimed that a "decedent suffered severe mental and emotional pain and anguish" from being "hospitalized for six weeks, during which time he was paralyzed, but also conscious and aware of his surroundings." 340 F. Supp. 2d at 873. Plaintiffs offer no evidence of anything approaching such mental injuries here. Accordingly, the Officers are entitled to summary judgment on Plaintiffs' IIED claims. See Klein v. State Farm Fire & Cas., 250 F. App'x 150, 154 (6th Cir. 2007) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986)) ("[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.")

## IV. Conclusion

For these reasons, the County's Motion for Summary Judgment (Doc. No. 65) will be granted, and the Officers' Motion for Summary Judgment (Doc. No. 69) will be granted in part and denied in part. The only claim remaining for trial is Plaintiffs' excessive force claim against Officer Fox.

An appropriate Order is filed herewith.

_____
WAVERLY D. CRENSHAW, JR.
CHIEF UNITED STATES DISTRICT JUDGE

29